ALONZO CHURCH ET AL., PARTNERS, APPELLANTS, v. NATIONAL NEWARK AND ESSEX BANKING COMPANY. RESPONDENT.

Argued November 22, 1921—Decided March 6, 1922.

1. Testimony that an endorsement upon a check, which later turned out to be fraudulent, was conditioned by the request or understanding that the bank with whom the check was deposited should communicate with the bank upon which it was drawn as to its genuineness is not admissible to qualify or vary the absolute or general endorsement.

2. The words "Attorney's Account," after a general endorsement on a check, is not notice to the bank in which it is deposited that the endorsement was special in its nature; the added words were simply a direction to the bank to credit the check to that account.

On appeal from the Essex County Circuit Court.

For the appellants, *Merritt Lane.*

For the respondent, *Pitney, Hardin & Skinner.*

The opinion of the court was delivered by

MINTURN, J.   Upon the following state of facts a judgment of nonsuit was directed at the Circuit.   Plaintiffs, a firm of eminent lawyers in the city of Newark, were depositing customers of the defendant company in the same city.

Prior to November 1st, 1919, a man bearing all the external evidences of a clergyman, called at the plaintiffs' offices and placed with them a claim for collection, amounting to $4,300.   In due time an apparently certified check drawn by the Keystone Construction Company of Philadelphia upon the Philadelphia National Bank, payable to the order of the plaintiffs, for the sum of $4,300, was received through the mail.   On November 1st this check was deposited by plaintiffs with the defendant company in due course of business to their account as "Attorneys," bearing this endorsement:

"Pay to the order of National Newark and Essex Banking Co. Newark, N. J. Church, Harrison and Roche, Attys. acct." At the same time some suggestion was made by the plaintiffs' agent depositing the check that it might be well to call up the Philadelphia bank in order to verify the genuineness of the check. But for some reason not apparent upon the record that course was not insisted upon or followed, and the check bearing the unqualified endorsement of the plaintiffs was passed through the clearing house, and returned a few days later to the defendant marked "Fraudulent check. Fraudulent certification." Coincident with the depositing of this check in the defendant's bank, the plaintiffs without further investigation drew another check for $4,150 to the order of the conspicuous and successful actor in the case, John Larkin; this check represented the amount due to the payee, less the plaintiffs' fees for services in the collection of the claim.

The defendant, upon discovering the falsity of the deposited check, charged back the amount of the check against the plaintiffs' account, and this suit was thereafter instituted to recover the amount of the fraudulent check with interest.

John Larkin lost no time in cashing his check, for at the same time that the fraudulent check was deposited, he went to the bank with the plaintiffs' representative and was there identified by him as the payee of the check, and then and there received the amount thereof.

John Larkin was apparently a clergyman. He wore, says the plaintiffs' witness, the apparel that "ministers generally wear;" and his collar dated back in formula to the days of the Holy Roman Empire, because, says the same witness, "it was one that was not buttoned in the front." Another evidence of his divine calling was that he informed the plaintiffs' representative, who so informed the bank's representative, that immediate payment of the check was imperative, because the Reverend payee was obliged to betake himself at once to the city of Rochester, where he was scheduled to deliver a sermon the next day.

Indeed, a perusal of the testimony would warrant one in confidently greeting this unctuous adventurer, as the Psalmist saluted the anointed of Israel: *"Tu es Sacerdos in æternum secundum ordinem Melchisedech."* In such an exigency, obviously, payment was at once made, and the Reverend John Larkin at once disappeared.

His advent in our midst serves to revive the ancient learning concerning "Pious frauds," now more or less contained in the modern doctrine of "Charitable uses;" as well as the ancient esoteric philosophical doctrine of "occult compensation," as a means of clerical rehabilitation. His impressive passing undeniably would carry with it its compensations, were it not for the complexity of the legal atmosphere which his presence created, and which has precipitated the legal controversy presented by this record.

The plaintiffs contend that their contract of endorsement upon the fraudulent check was conditioned by the request or understanding which their representative made to or had with the representative of the defendant bank, that before assuming liability upon the check as endorsers, the bank should satisfy itself by communicating with the Philadelphia bank, upon which it was drawn, as to the genuineness of the check. The difficulty inherent in this contention is that it runs counter not only to the provisions of the Negotiable Instrument act, but also to the general trend of authority in this state, since the determination in 1871 in *Chaddock* v. *VanNess,* 35 *N. J. L.* 517. The effect of these adjudications is to define and settle the legal rule in this state regardless of its variations in other states, when the inquiry is not intermingled with a suggestion of fraud, that such testimony is not admissible in the case of negotiable paper to qualify or vary an absolute or general endorsement. *Remington* v. *Wright,* 43 *Id.* 451; *Johnson* v. *Ramsey, Id.* 279; *Anthony* v. *Fritts,* 45 *Id.* 1; *Stiles* v. *Vandewater,* 48 *Id.* 67; *Foley* v. *Emerald Bridge Co.,* 61 *Id.* 428; *Gerli* v. *National Mill Co.,* 80 *Id.* 464.

In the light of this rule the learned trial court was correct in its disposition of the case, since the conversations between

the plaintiffs' representative and the bank's representative could not alter the legal status created as between the immediate parties by the general and absolute character of the endorsement.

It is contended, however, that the character of the endorsement was special in its nature and tantamount to notice to the bank of the fiduciary nature of the transaction involved. We think the superadded words in the endorsement upon which this contention is based were simply a direction by the plaintiffs to the bank, as to which account the amount of the check was to be credited; a matter entirely immaterial to the bank and for plaintiffs' convenience only.

There are of course recognized methods, such as the superscription "without recourse," universally adopted under the doctrine and recognized usage of the law merchant, for qualifying or conditioning an endorsement; methods which can leave no doubt as to the intent of the endorser in the assumption of a qualified liability only. 3 R. C. L. 370, and cases cited.

In this case, however, no such intent appears, and the endorsement must be held to occupy the status of an absolute contract, with the resulting legal liability which such a comprehensive endorsement imports. _Aronson_ v. _Nurenberg,_ 218 _Mass._ 376.

The judgment must therefore be affirmed.

_For affirmance_ — THE CHANCELLOR, CHIEF JUSTICE, SWAYZE, TRENCHARD, BERGEN, MINTURN, KALISCH, BLACK, KATZENBACH, WHITE, HEPPENHEIMER, WILLIAMS, GARDNER, VAN BUSKIRK, JJ.   14.

_For reversal_—None.